OVERTON, JR., ET AL. v. BOARD OF COUNTY COMMISSIONERS OF PRINCE GEORGE'S COUNTY ET AL.

[No. 242, September Term, 1959.]

*Decided July 6, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and HORNEY, JJ.

*H. S. Garber* and *James F. Vance,* with whom was *William C. Overton, Jr.,* on the brief, for appellants.

*Robert B. Mathias,* with whom were *Harry L. Durity* and *James Magruder Rea* on the brief for Board of County Commissioners of Prince George's County, one of the appellees.

*C. Calvert Lancaster,* with whom were *Fisher & Lancaster* and *Roscoe H. Parker* on the brief for Genevieve E. Gibbons, et al., the other appellees.

BRUNE, C. J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court for Prince George's County which affirmed a rezoning resolution of the Board of County Commissioners of that County (the Board), acting as a District Council for the Maryland-Washington Regional District in Prince George's County, and dismissed the petition for review. The rezoning resolution had granted a reclassification from R-R (Rural-Residential) to C-O (Commercial-Office Building) of a 9.7 acre tract of land (hereafter called Parcel B). Parcel B was part of a 44-acre piece of land (the Gibbons Tract), the other parts of which are termed A and C. At the same time at which the reclassification of Parcel B was made, special exceptions were granted for Parcels A and C to permit the construction of Care Home facilities. The remainder of the surrounding area is zoned R-R.

The appellants, residents of the neighborhood, protested the granting of the rezoning and the exceptions before the Board and before the lower court, but their petition for review refers only to the rezoning. They contend that the granting of the rezoning and of the exceptions is invalid for the following reasons: first, that an agreement signed by the proponents of the rezoning and allegedly accepted by the Board constitutes conditional rezoning; second, that there was no evidence of mistake in the original zoning, or of subsequent substantial change in the area, to support the rezoning of Parcel B; third, that the exceptions for Parcels A and C were granted without evidence as to hardship and that the project did not conform to the definition of a Care Home; fourth, that the intended use of Parcel B would violate the C-O zoning restrictions; fifth, that the appellants were denied their rights to a full and proper hearing before the Board; and sixth, that the agreement with the owners and contract purchasers constitutes a prejudgment on an unfiled request for an exception to the C-O zoning.

The rezoning and the exceptions were granted after a hearing on June 17, 1959, in order to permit the construction in Prince George's County, near the Potomac River, of a high rise (8-story) building, with adjoining low rise buildings in

which there would be 556 apartments, with medical, recreational and commercial facilities, restricted to occupancy by elderly people in good health. It is proposed that the project be constructed by a named charitable foundation or with this foundation as "sponsor" under F. H. A. regulations, but it is planned to be self-supporting.[1] It is hoped that the financing could be arranged in great part, if not entirely, through agencies of the federal government. The total cost is estimated at seven to eight million dollars. (The record does not show any breakdown as between land cost, building costs (other than an "infiltration" plant), and builder's profit.)

The exceptions for Parcels A and C were under the "Care Home" special exception permitted in R-R zones by the zoning ordinance for Prince George's County. The change in classification from R-R to C-O for Parcel B was made to permit the construction of the main building in excess of the 3-story limit in the R-R zone, and to permit shops and medical offices to be on the first floor of the building. (A special exception to the C-O classification is also required to permit a Care Home in such a classification. The exception had not been granted when the lower court made its decision in the instant case, and therefore is not before us.)

The appellee argues that appellants' third contention, in which they attack the special exceptions for Parcels A and C, is not properly before this Court because they were not attacked in the lower court. It would appear that this position is correct. Although the petitions for exceptions and the petition for rezoning were considered at the same time by the Board, the Board passed separate resolutions on each petition. In their petition to the Circuit Court for review of the Board's action, the appellants referred to the zoning petition involving Parcel B, and the only specific relief requested in their petition is the setting aside of the order "granting C-O classification to said Parcel B." They added a prayer for general relief, but since their petition said nothing whatever about the special exceptions as to Parcels A and C granted

---

1. The genuineness of this foundation was questioned below, and the taxability of the project when constructed was also questioned below. Neither question is presented on this appeal.

by a separate resolution, only the resolution rezoning Parcel B was properly before the Circuit Court or is properly before this Court. The appellants' contention on this point would give the prayer for general relief entirely too broad a scope. It may be that this makes little practical difference, for the Circuit Court noted that the C-O classification was "the crux of the case" and stated that "[i]f this should be reversed the Parcels A and C would then become useless insofar as the special exceptions were concerned."

The appellants' first and sixth contentions, that the rezoning is invalid because it was based upon an agreement between the owners and contract purchasers on the one hand and the Board on the other, are also without merit. The only agreement introduced in evidence is one addressed to the Board and signed by the owners and contract purchasers of the Gibbons' tract promising in return for the rezoning of Parcel B that if it is impossible to construct the 8-story building, they will immediately file a petition to rezone Parcel B as R-R. The agreement recites that "We, the undersigned, the contract owners" of Parcel B, promise the above. There is no indication that the agreement was signed, or was intended to be signed by the Board. The appellants, however, rely upon a statement made by counsel for the Gibbonses when he introduced the agreement. He stated that the agreement was signed by representatives of the foundation, the Gibbonses, "and the County Commissioners sitting as a district council." Just why it was stated that the County Commissioners had signed the agreement is not clear, because it is apparent that the agreement was addressed to them, the description in the agreement of the signatories refers only to the "contract owners" of the land, and it was in fact signed by only the latter and by the owners, and the erroneous statement of counsel for the Gibbonses cannot alter the fact.

We find no sufficient basis upon which to find that the action of the Board was in some way based upon the "agreement." *Pressman v. Mayor and City Council of Baltimore,* 222 Md. 330, 344, 160 A. 2d 379. The resolution of the Board makes no reference to the agreement, nor does it incorporate any conditions referable thereto, though the use of the property as reclassified is made subject to regulations ap-

plicable generally to the new classification and an additional requirement is typed into a standard form reading: "Subjèct to the recommendations and restrictions of the Md.-Nat. Cap. Pk. and Planning Commission." The suspicions of an actual agreement expressed by the appellants are their inferences and are not supported by any direct testimony. We think that in the circumstances it would "be merely speculative to impute to the legislative body an intention to impose conditions [based upon this 'agreement'] or to make them the basis of its action in rezoning the property." See *Pressman, supra,* 222 Md. at 344-345.

The appellants also argue that a proper hearing was not held by the Board and therefore the actions taken as a result of the hearing are void. In particular, they allege that the incorrect procedures were: (1) failure to provide appellants with an opportunity to cross-examine witnesses and inspect documents presented before the Board on June 17, 1959; (2) failure to request and consider recommendations of the Planning Commission on the entire project; (3) failure to provide appellants with an opportunity to hear the evidence, inspect documents, cross-examine witnesses, or for the Board to receive recommendations of the Planning Commission on the occasion when the agreement was made between the Board and the foundation and owners of the property.

As to the matter of cross-examination of witnesses and inspection of documents, the appellants cite two Maryland cases, *Board of Zoning Appeals v. McKinney,* 174 Md. 551, 199 A. 540, and *Heath v. Mayor and City Council of Baltimore,* 187 Md. 296, 49 A. 2d 799, as setting out the requirements for such hearings. Both cases are inapplicable to the instant case, because they involve administrative bodies acting in quasi-judicial roles, whereas here we have the County Commissioners acting in their legislative capacity. In addition, both of the above cited cases, in discussing the requirements of a hearing before the administrative bodies, state only that a public hearing implies the right to present testimony, but no mention is made of the right to cross-examine witnesses or inspect documents. Even if inspection of documents and cross-examination of witnesses were necessary (see *Braden*

*v. Much,* 403 Ill. 507, 87 N. E. 2d 620), there was no request by any appellants for that which they now claim was denied them, and there is no showing whatever that it would have been denied them had it been requested.

With regard to seeking the advice of the Planning Commission, we fail to see how the action of the Board can be void because of its failure to request a recommendation from the Planning Commission on special exceptions (which, as noted, are not even properly before us). Even if they were properly before us, special exceptions are to be determined by the Board and it is not required to seek the Commission's advice thereon. Also, it is quite evident from the testimony of Mr. Giauque that the staff of the Planning Commission actually considered both together, though its recommendations were carefully (and with some difficulty) confined to the rezoning of Parcel B. The Board considered both at the same time, and for practical purposes actually had the views of the staff on both matters, even though it was not required to seek them as to the exceptions.

With regard to the appellants' allegations of impropriety based upon an alleged agreement between the Board and the proponents of the rezoning reached at some secret meeting, we need say no more than that, on the record before us, we find no sufficient evidence to show that there was any such meeting or agreement.

The appellants' second and fourth contentions remain to be considered and may be taken up together. The second is that there is no evidence of an error in the original zoning or of any change in conditions, and the fourth is that the rezoning of Parcel B is invalid because the intended use of the property would not be permissible under the new (C-O) classification without a special exception. These contentions point up the unsatisfactory condition in which this case comes to us for adjudication. No application had been filed for a special exception when this case was heard by the Circuit Court. We are informed that such an application has since been filed and granted and that review has been sought in that court, but that case is not before us now.[2]

---

2. We understand that a special exception was to be sought to

The testimony suggests (though no question with regard thereto is here presented for decision) that this project is something of a hybrid, being neither an apartment nor yet a Care Home in the usual sense. In one breath we are told that its purpose is to furnish housing for the aged and that only those in good health will be accepted as tenants. In the next breath, we are told of provisions for nursing care, provisions for wheel-chair or non-ambulatory "patients"—at one point hastily corrected to "tenants," at others not—and we are told of provisions for medical and dental care. And we gather that at least a major purpose of the seven floors above the store and administrative office floor of the "high rise" building is to provide residence units for tenants or patients (whichever they may be) requiring bed care or having difficulty in getting about. Such use rather obviously does not fit the ordinary concept of commercial or office use. Sec. 19 A. 11 of the Zoning Ordinance does permit a variety of uses in a C-O zone as "special exceptions," and among such uses are "hospital, nursing and care homes." The building height limit in a C-O zone is eight stories or 90 feet under Sec. 19 A. 4 of the Zoning Ordinance. This particular section says nothing as to the purposes for which any floor or floors may be used.

Although we have found no evidence sufficient to establish any agreement between the proponents of the rezoning on the one hand and the Board on the other, we think it quite clear that the rezoning application was presented and considered as the first step in a plan[3] which would include the eight-story, high-rise building, that the construction of such a building was regarded as essential to the consummation of the whole plan for providing housing for the elderly, and that the furnishing of such housing was urged and relied upon as an

permit the use of the "high rise" building in part for a Care Home. We do not know whether any objection has been made on the basis of the last sentence of Sec. 19 A. 12 of the Prince George's County Zoning Ordinance, which prohibits more than one dwelling unit in a business building or over offices where the side lot line of a lot in a C-O zone adjoins an R-R (or R-55) zone. We are not informed whether this limitation has any applicability.

3. Cf. *Board of Zoning Appeals of Baltimore County v. Bailey,* 216 Md. 536, 141 A. 2d 502.

important basis for establishing the rezoning as a proper form of spot zoning. No explanation appears in the record as to why an application for a special exception, contingent upon the C-O rezoning being granted, was not (or perhaps could not) have been filed contemporaneously with the application for C-O rezoning and heard and considered contemporaneously therewith. Whatever the reason, the result is that the case comes to us on this record on a piecemeal basis. That is not a matter of our choice. We must take it as presented to us and decide it accordingly. That means that only an ordinance rezoning this 9.7 acre tract from R-R to C-O is now before us.

Applying the familiar tests of the validity of rezoning, we think it quite clear that neither an error in original zoning nor any change in conditions warranting a C-O classification for this one tract in the midst of an R-R zone, has been established. No evidence was introduced as to mistake or change since the existing zoning had been adopted (in 1957). Testimony favorable to the passage of the rezoning resolution was, in general, that there was need for this type of housing for the elderly in every locality, that this particular location was excellent for this type of project, and that its construction was feasible financially and otherwise and that it would not adversely affect the surrounding area. While this testimony would be relevant to support a change in zoning where mistake or change had already been shown, it is not a substitute for it. The Park and Planning Commission, whose duty it is to give the Board recommendations on rezoning petitions, could not recommend that the petition be granted because in its opinion there was no mistake or change. No finding was made by the Board of any change or mistake, nor did the trial court make any such finding. Unless there is something to take this case out of the usual rules applicable to rezoning, this resolution cannot be sustained. Lengthy citation of authorities seems superfluous. Among our more recent cases, see *County Comm'rs of Howard County v. Merryman*, 222 Md. 314, 159 A. 2d 854; *Baltimore v. N. A. A. C. P.*, 221 Md. 329, 334-335, 157 A. 2d 433; *Renz v. Bonfield Holding Co.*, 223 Md. 34, 158 A. 2d 611; *West Ridge, Inc. v. Mc-*

*Namara,* 222 Md. 448, 160 A. 2d 907 (rule restated, rezoning upheld because of change).

There was no effort to show any need whatever for a commercial or office classification in this area, except (a) as an incident to the residential units (however they may properly be denominated or classified) proposed to be built on Parcels A, B and C as parts of this project and (b) as a springboard for obtaining the special exception which would be required to permit the building of the "high rise" structure chiefly for residential units.

The fact that the C-O classification did not exist at the time when the comprehensive zoning map for this area was adopted in 1957 and came into existence only in 1958 does not alter the situation. Though the establishment of such a classification indicates a lack of a sufficiently detailed classification in the commercial field prior to its adoption, it indicates no error as to the 1957 zoning of the property here involved as Rural Residential, nor does it indicate any change in conditions in this area. Unlike the situation in *Huff v. Board of Zoning Appeals of Baltimore County,* 214 Md. 48, 133 A. 2d 83, and in *Costello v. Sieling,* 223 Md. 24, 161 A. 2d 824, we have here no indication of any legislative intent that the new classification might be superimposed upon property previously classified as residential on substantially the same basis that a particular use might be allowed in a residentially zoned area as a special exception.

We conclude that the resolution rezoning Parcel B is not sustainable on the record before us and that the order of the Circuit Court affirming it should be reversed.

*Order reversed, with costs.*